F. L. WILLIAMSON v. LAFAYETTE HOLT.

(Filed 29 April, 1908).

**Contracts—Sales—Vendor and Vendee—False Representations— Quality—Caveat Emptor.**

Representations made by the seller of the capacity of an ice plant known by the purchaser to be second-hand, and who had knowledge that it had been unsuccessfully operated, and also of other facts and circumstances indicative of its actual condition, and to whom, being a mechanic, full opportunity for investigation had been given before purchasing, are not available as a defense by way of counterclaim because of their being false, in an action to recover the amount of a bond given for the purchase price. In such instances the doctrine of *caveat emptor* applies.

ACTION tried before *Councill, J.,* and a jury, at September Term, 1907, of ALAMANCE.

This is an action to recover $1,050, the amount of a bond given by the defendant on 29 February, 1904, for an ice plant. Defendant, in his answer, admitted the execution of the bond, but denied any liability upon it, and set up a counterclaim on the ground that it was obtained by false and fraudulent representations as to the condition and capacity of the plant. The defendant himself testified:

"Q. The first conversation that you had with anybody concerning this ice plant was with Mr. Meechum?

"A. Yes, sir; that is my recollection.

"Q. Mr. Meechum had been secretary and treasurer of this company?

"A. Yes, sir.

"Q. He had been operating this plant?

"A. Yes, sir; the Home Ice and Refrigerator Company.

"Q. You talked with Mr. Meechum about buying the plant?

"A. He talked with me.

"Q. And in that conversation Mr. Meechum told you that the Home Ice Company had been a failure, so far as making money out of the plant?

"A. No, sir; he did not say that.

"Q. What reason did he give for its having quit?

"A. He did not give any.

"Q. Did Mr. Meechum tell you in that conversation that the plant would not make ice or would not make a proper amount of ice?

"A. I don't know whether he said those words; he said that they had given it up.

"Q. And they had given it up because the plant would not make its capacity of ice?

"A. Because it would not make ice.

"Q. And in that very conversation did you not say to Mr. Meechum that if you had it you could make ice?

"A. No, sir; I told him I could do the repairs.

"Q. Didn't you tell him that you knew what to do with it—that it needed a thorough overhauling and putting in new parts?

"A. No, sir.

"Q. You knew that at the time the original plant was brought to Burlington it was a second-hand plant?

"A. I had heard it.

"Q. You knew it, didn't you?

"A. No, sir; I had very little business with it.

"Q. Didn't you supply parts for that plant when it was originally set up in Burlington?

"A. I might have furnished some valves. I had nothing to do with the work on it nor with the parts. I furnished some valves and things, that is all.

"Q. After your talk with Mr. Meechum, wherein Mr. Meechum told you that they had made a failure of it because it would not make its capacity of ice and they had given it up, you went then to see Mr. Williamson?

"A. Yes, sir.

"Q. And Mr. Williamson went over to the house in which was the machinery and the plant proper, and you went over it, did you not?

"A. Yes, sir; I went over it in company with Mr. Nicholson.

"Q. At the time when Mr. Williamson was with you, was Mr. Nicholson with you?

"A. Mr. Williamson was along both times, I think. We were there a couple of times.

"Q. One of the times that you and Mr. Williamson were there Mr. Nicholson was not along?

"A. Yes, sir.

"Q. Mr. Williamson just opened the doors and let you have full swing in looking it over?

"A. Yes, sir; we were there together.

"Q. He did not attempt to conceal any part of the plant or machinery from you?

"A. No, sir; nothing of the kind.

"Q. When you and Mr. Nicholson went to see Mr. Williamson to buy this plant you agreed to buy it from him at the price of $2,500, did you not?

"A. Yes, sir.

"Q. And you immediately then and there executed your notes for $1,250 each, did you not?

"A. We signed notes; yes, sir.

"Q. Didn't that property stand there absolutely idle and exposed, as property would be, to the elements during the whole of the winter of 1904?

"A. Yes, sir; I think so.

"Q. I ask you to look at that bill, Mr. Holt, and tell me if it does not contain items for work done on that plant?

"A. Yes, sir; that is every bit my handwriting.

"Q. Then you did do repair work on that plant?

"A. Yes, sir; but I did not know where it was going.

"Q. You knew, and knew at the time you were making this purchase, that this was the identical plant that you had supplied these parts for and had done this work for?

"A. I suppose so; yes, sir.

"Q. How many times did you go over this plant before you bought it?

"A. I was only inside of it twice.

"Q. You did that before you purchased it?

"A. Yes, sir; I think so. It was in the year 1904. I remember it was cold weather about the time we made the trade.

"Q. You knew that you had supplied parts and had done some work there?

"A. They had sent for some fittings.

"Q. You knew that the plant had been closed out and that the plant was for sale?

"A. Yes, sir.

"Q. Did you ask for any explanation of why the plant was to be sold?

"A. No, sir.

"Q. You did not even ask any questions as to why that plant was being closed out?

"A. No, sir; I did not.

"Q. You did not pretend to ask whether the old company had made a success of it or not—a financial success of the plant?

"A. No, sir; I did not.

"Q. You have heard the testimony here of these people. You did go there with Mr. Meechum and Mr. Nicholson to make examination?

"A. Yes, sir.

"Q. Was it before or after you went with Mr. Williamson?

"A. I think it was after, but I cannot say positively which visit was made first.

"Q. But you did make two visits and examinations of the plant?

"A. Yes, sir.

"Q. And these gentlemen threw everything open to you and let you have free will?

"A. Yes, sir; they opened the doors.

"Q. And gave you free access to every part of the plant?

"A. Yes, sir."

When the evidence was closed the court, on motion of the plaintiff's counsel, gave judgment for the amount of the note, and the defendant appealed.

*Z. V. Taylor* and *Parker & Parker* for plaintiff.
*W. H. Carroll* and *Long & Long* for defendant.

WALKER, J.   The evidence in the record is quite voluminous, but fortunately it is not necessary to state even the substance of it in order to a correct understanding of the case. At the time of the sale of the plant the plaintiff stated to the defendant that if he would make some repairs it would turn out about 4,400 pounds of ice a day.   There was also evidence that the plant had produced as much as that before the sale.   The defendant lived in Burlington, where the ice plant was.   Before he and Nicholson purchased it they made two visits to the ice factory for the purpose of making an examination of the plant.   The evidence of the defendant himself shows that he was a machinist and the plaintiff a grocer, and that he and Nicholson were permitted both times to make a free and full investigation for themselves of the condition of the plant, and, besides, that he knew it was second-hand when it was brought to Burlington, it having been in use for some time.   As a machinist he had furnished new valves and other parts for it when it was originally installed.   That the plant was not in good condition at the time he and Nicholson bought it had come to his knowledge before the time of the purchase.   The few extracts selected at random from the evidence as contained in the record and set out in our statement of the case will serve to show more definitely whether or not the defendant was influenced by any fraudulent representation of the plaintiff to make the purchase.   There was evidence to the effect that the defendant and Nicholson sold the plant to the Burlington Ice Company at $2,500, which was

the price they gave for it, and received in payment of the purchase money stock of that company, the par value of which was equal to that amount and which they took at that valuation; that the Burlington Ice Company was afterwards placed in the hands of a receiver, at the instance of the defendant, and that the plant was sold, and bought by Nicholson.

In the view we take of this case it falls directly within the decision of the Court in *Cash Register Co. v. Townsend,* 137 N. C., 652. In that case *Justice Brown,* for the Court (at p. 655), says: "All the authorities are to the effect that where the false representation is an expression of commendation or is simply a matter of opinion the courts will not interfere to correct errors of judgment. *Walsh v. Hall,* 66 N. C., 236. The law will not give relief unless the misrepresentation be of a subsisting fact. *Hill v. Gettys,* 135 N. C., 375. What has been called 'promissory representations,' looking to the future as to what the vendee can do with the property, how much he can make on it and, in this case, how much he can save by the use of it, are on a par with false affirmations and opinions as to the value of property and do not generally constitute legal fraud. Benjamin on Sales (7th Ed.), 483 *et seq.; Gordon v. Parmelee,* 2 Allen (Mass.), 212; *Long v. Woodman,* 58 Me., 52, and cases cited. Mr. Clark, in his work on contracts, states in substance that commendatory expressions or exaggerated statements as to value or prospects, or the like, as where the seller puffs up the value and quality of his goods or holds out flattering prospects of gain, are not regarded as fraudulent in law. (Pages 332-334). It is the duty of the purchaser to investigate the value of such expressions of commendation. He cannot safely rely upon them. If he does he cannot 'treat it as fraud, either for the purpose of maintaining an action of deceit or for the purpose of rescinding a contract at law or in equity. *Saunders v. Hatterman,* 24 N. C., 32; 14 Am. and Eng. Enc. (2d Ed.), 34, and cases cited. Mr. Kerr, in his work on fraud and mistakes

(at p. 83), says: 'A misrepresentation, to be material, should be in respect of an ascertainable fact as distinguished from a mere matter of opinion. A representation which merely amounts to a statement of opinion goes for nothing, though it may be true, for a man is not justified in placing reliance on it.' Again, 'A man who relies on such affirmation made by a person whose interest might so readily prompt him to invest the property with exaggerated value does so at his peril and must take the consequences of his own imprudence.' " There the alleged false or fraudulent representation consisted in a statement by the plaintiff's agent to the defendant that the use of a cash register would save the expense of employing a bookkeeper, and it was held not to be such a fraudulent representation as would avoid the contract of sale, it being nothing more than "dealer's talk" when puffing his wares.

It is difficult to see how the defendant was deceived by the plaintiff into buying the ice plant, when he at the time had full knowledge of facts in regard to the condition of the plant, which should at least have put him on his guard and stimulated greater inquiry. He was himself a machinist, and employed Hyatt, who was an expert, to operate the plant. He had free access to the premises for the purpose of making any desired investigation, and if he was not satisfied with his own ability to discover defects, if there were any, he might easily have enlisted the services of Hyatt or some one else having greater knowledge of the matter than he had for that purpose. It does seem from the evidence that the means were at hand by which he could have ascertained the exact condition of the plant, if he had wished to be better informed, before making the purchase. He knew that the plant had been "given up" because it would not make ice or that its output had not been equal to its full capacity. The statement of the plaintiff was evidently intended to be the expression of an opinion as to how much ice the plant would make if put in good condition, and the evidence shows that it was so understood by the de-

fendant at the time. It is said in Benjamin on Sales (7th Ed.), at p. 483: "Fraudulent promises as to the future, as to what the vendee could do with the property, how much he could make on it, etc., do not constitute legal fraud." The same idea is expressed more fully in *Gordon v. Parmelee,* 84 Mass. (2 Allen), 213, where the Court says: "The alleged false statements concerning the productiveness of the land and its capacity to furnish support for cattle constituted no defense to the notes. They fall within that class of affirmations which, although known by the party making them to be false, do not, as between vendor and vendee, afford any ground for a claim of damages, either in an action on the case for deceit or by way of recoupment in a suit to recover the purchase money. They come within the principle embodied in the maxim of the civil law, *Simplex commendatio non obligat.* Assertions concerning the value of property which is the subject of a contract of sale, or in regard to its qualities and characteristics, are the usual and ordinary means adopted by sellers to obtain a high price, and are always understood as affording to buyers no ground for omitting to make inquiries for the purpose of ascertaining the real condition of the property. Affirmations concerning the value of land or its adaptation to a particular mode of culture or the capacity of the soil to produce crops or support cattle are after all only expressions of opinion or estimates founded on judgment, about which honest men might well differ materially. Although they might turn out to be erroneous or false, they furnish no evidence of any fraudulent intent. They relate to matters which are not peculiarly within the knowledge of the vendor and do not involve any inquiry into facts which third persons might be unwilling to disclose. They are, strictly speaking, *gratis dicta.* The vendee cannot safely place any confidence in them, and if he does he cannot make use of his own want of vigilance and care in omitting to ascertain whether they were true or false as the basis of his claim for damages in reduction

of the amount which he agreed to pay for the property."
The case of *Long v. Woodman, supra,* furnishes another
equally strong statement of the rule: "To entitle a party to
maintain an action for deceit by means of false representa-
tions he must, among other .things, show that the defendant
made false and fraudulent assertions in regard to some fact or
facts material to the transaction in which he was defrauded,
by means of which he was induced to enter into it.   The mis-
representation must relate to alleged facts or to the condition
of things as then existent.   It is not every misrepresentation
relating to the subject-matter of the contract which will ren-
der it void or enable the aggrieved party to maintain his
action for deceit.   It must be as to matters of fact substan-
tially affecting his interests, not as to matters of opinion,
judgment, probability or expectation.   *Hazard v. Irwin,* 18
Pick., 95.   An assertion respecting them is not an assertion
as to any existent fact.   The opinion may be erroneous; the
judgment may be unsound; the expected contingency may
never happen; the expectation may fail.   An action of tort
for deceit in the sale of property does not lie for false and
fraudulent representations concerning profits that may be
made from it in the future."   The following cases also sus-
tain the doctrine: *Halton v. Noble,* 83. Cal., 7; *So. Dev.
Co. v. Silva,* 125 U. S., 247; *Mooney v. Miller,* 102 Mass.,
217; *Pedrick v. Porter,* 87 Mass. (5 Allen), 324.   The test
of whether there has been merely an expression of opinion
or the positive statement of a fact depends not so much upon
the absence or presence of an express assertion based on
personal knowledge as upon the character of the statements
alleged to be true.   14 Am. and Eng. Enc. (2d Ed.), p. 36.
A statement taking the form of an expression of opinion may
sometimes constitute actionable fraud, while one more posi-
tive and implying knowledge of the facts may not have that
effect in law.   14 Am. and Eng. Enc. (2d Ed.), pp. 33 *et seq.*

We do not decide, therefore, that a party cannot be liable

for a false representation because it is promissory in form, though in substance the assertion of a fact as existing. If he makes a statement which is calculated to deceive the other party and which he knows to be false, and thereby intentionally misleads the latter, to his prejudice, it may amount to such an affirmation of a fact as to constitute actionable fraud or deceit, although the statement may be seemingly a mere expression of opinion, or what is sometimes called a promissory representation. 14 Am. and Eng. Enc. of Law (2d Ed.), p. 36 and note 5.

The case of *May v. Loomis,* 140 N. C., 350, cited by the appellant in support of his contention, is not in point, and therefore not an authority in his favor. In that case there was the representation of a fact, false within the knowledge of the party who made it, which was calculated and intended to deceive, and not the mere expression of an opinion.

In our case the evidence does not disclose any taint of fraud in the negotiations between the parties for the sale by the plaintiff and the purchase by the defendant of the ice plant. The doctrine of *caveat emptor* applies, for the defendant had been put upon inquiry by his knowledge of the facts, and he was given full opportunity to investigate for himself, which he undertook to do. In *Cash Register Co. v. Townsend,* 137 N. C., 658, it is said: "When the purchaser undertakes to make an investigation of his own, and the seller does nothing to prevent this investigation from being as full as he chooses to make it, the purchaser cannot afterwards allege that the vendor made misrepresentations," citing *Jennings v. Broughton,* 5 De Gex M. & G., 126; *Development Co. v. Silva,* 125 U. S., 259.

We conclude from what has been said that the court was right in giving judgment for the plaintiff.

No Error.