Carmayer, LLC v. Koury Aviation, Inc., 2017 NCBC 80.

STATE OF NORTH CAROLINA

GUILFORD COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16 CVS 2717

CARMAYER, LLC,

          Plaintiff,

   v.

KOURY AVIATION, INC.;
BRADFORD A. KOURY; and
THOMAS HURLOCKER,

          Defendants.

**ORDER AND OPINION ON
PLAINTIFF'S MOTION TO AMEND
AND DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

1. **THIS MATTER** is before the Court on Plaintiff Carmayer, LLC's ("Carmayer") Motion to Amend Complaint (the "Motion to Amend") and Defendants Koury Aviation, Inc. ("Koury Aviation"), Bradford A. Koury ("Koury"), and Thomas Hurlocker's ("Hurlocker") (collectively, the "Defendants") Motion for Summary Judgment. The Motion to Amend and the Motion for Summary Judgment are collectively referred to herein as "the Motions." Having considered the Motions, the briefs, and the arguments of counsel, the Court **DENIES** the Motion to Amend and **GRANTS in part** and **DENIES in part** the Motion for Summary Judgment.

> *Rossabi Reardon Klein Spivey PLLC, by Amiel J. Rossabi and Elizabeth M. Klein, for Plaintiff.*

> *Tuggle Duggins P.A., by Denis E. Jacobson, Jeffrey S. Southerland, and Richard W. Andrews, for Defendants.*

Robinson, Judge.

## I.   INTRODUCTION

2.    This litigation arises out of Carmayer's purchase of a 1976 Cessna 421C twin-engine propeller aircraft (the "Cessna 421C").  Carmayer sought advice from Defendants in purchasing a plane that it could charter for hire under part 135 of the Federal Aviation Regulations ("Part 135").  In October 2014, Carmayer purchased the Cessna 421C from a third-party for the purpose of putting it on Koury Aviation's Part 135 Charter Certificate ("Koury Aviation's Part 135 Certificate").  After purchasing the Cessna 421C, it was flown back to Koury Aviation's facility in Greensboro, North Carolina where Defendants made repairs to the aircraft in order to add it to Koury Aviation's Part 135 Certificate.  Ultimately, the Federal Aviation Administration ("FAA") did not certify the Cessna 421C under Part 135.  Carmayer learned that the Cessna 421C may never be capable of Part 135 certification or, at the very least, that such certification would require enormous cost.

## II.   PROCEDURAL HISTORY

3.    The Court sets forth here only those portions of the procedural history relevant to its determination of the Motions.

4.    Carmayer initiated this action by filing its Complaint on January 11, 2016. (ECF No. 1.)   The Complaint asserts claims against Defendants for negligent misrepresentation, unfair and deceptive trade practices ("UDTP"), breach of fiduciary duty, negligence, and gross negligence.  (ECF No. 1 at 8, 10−12.)

5.    This action was designated as a mandatory complex business case by order of the Chief Justice of the Supreme Court of North Carolina dated February 17, 2016,

(ECF No. 3), and assigned to Chief Business Court Judge James L. Gale by order dated February 19, 2016, (ECF No. 4). This case was later reassigned to the undersigned by order dated July 5, 2016. (ECF No. 21.)

6. On March 16, 2016, Defendants filed their answer and counterclaims, raising, *inter alia*, the economic loss doctrine as an affirmative defense. (Defs.' Answer to Compl. & Countercls. 6, ECF No. 9.)

7. On April 11, 2016, Carmayer filed its reply. (ECF No. 11.)

8. Following the completion of discovery, on March 17, 2017, Defendants filed the Motion for Summary Judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure ("Rules(s)"), (ECF No. 45), and a brief in support, (ECF No. 46).

9. On May 16, 2017, the Court held a hearing on the Motion for Summary Judgment.

10. On June 2, 2017, the Court entered an order directing the parties to submit supplemental briefing on whether the economic loss rule applied to any of Plaintiff's claims. (ECF No. 64.)

11. Defendants and Plaintiff filed their supplemental briefs on the application of the economic loss rule on June 16, 2017 and June 26, 2017, respectively. (ECF Nos. 65−66.)

12. On June 28, 2017, Plaintiff filed the Motion to Amend pursuant to Rule 15(a), (ECF No. 71), and a brief in support, (ECF No. 73).

13. The Motions have been fully briefed and are now ripe for resolution. Pursuant to Rule 7.4 of the General Rules of Practice and Procedure for the North

Carolina Business Court ("BCR"), the Court elects to rule on the Motion to Amend without a hearing.

### III. FACTUAL BACKGROUND

14. The Court does not make findings of fact when ruling on a motion for summary judgment, but it may either state those facts that it believes are not in material dispute, state those facts on which a material dispute forecloses summary adjudication, or summarize the underlying facts to provide context for its ruling. *E.g.*, *In re Estate of Pope*, 192 N.C. App. 321, 329, 666 S.E.2d 140, 147 (2008). The following statement of facts is solely for the purpose of this Order and Opinion.

#### A. **The Parties**

15. Carmayer is a North Carolina limited liability company. (ECF No. 1 at ¶ 1; ECF No. 9 at 1, ¶ 1.) Rocco Scarfone ("Scarfone") and Amiel Rossabi ("Rossabi") are Carmayer's managers and its only members. (Defs.' Mot. Summ. J. Ex. C, at 7:15–21, ECF No. 48.)

16. Koury Aviation is a North Carolina corporation. (ECF No. 9 at 8, ¶ 1; Reply & Affirmative Defenses ¶ 1, ECF No. 11.1.) Koury is the President of Koury Aviation. (ECF No. 1 at ¶ 3; ECF No. 9 at 1, ¶ 3.) Hurlocker is a mechanic and Koury Aviation's director of maintenance. (Mem. Opp'n Defs.' Mot. Summ. J. Ex. A, at 83:1–6, ECF No. 54.)

#### B. **Part 135**

17. A Part 135 certificate allows an aircraft to be operated for hire. (ECF No. 54 at Ex. B, 14:16–15:4.) To add an aircraft to a Part 135 certificate, an operator

must submit the aircraft and its documentation to the FAA for an inspection. (ECF No. 54 at Ex. B, 17:11–21:8.) The documentation, sometimes referred to as a conformity binder, must include the inspection and maintenance program that the operator intends to observe in inspecting and maintaining the aircraft. (ECF No. 48 at Ex. E, 24:15–25, 29:1−20; ECF No. 54 at Ex. B, 15:5–18:24.) Under the Federal Aviation Regulations, the FAA may approve one of several different inspection and maintenance programs for an aircraft, including the aircraft manufacturer's factory program, an Approved Aircraft Inspection Program ("AAIP"), or a traditional part 43D program written by the operator. (ECF No. 54 at Ex. B, 15:5–21:8.) The FAA, through the principal maintenance inspector at the local flight standards district office, has exclusive authority over whether to certify an aircraft under Part 135. (ECF No. 48 at Ex. I, 23:19–24:4.)

18. On January 17, 2013, the FAA issued Koury Aviation's Part 135 Certificate. (Defs.' Mot. Summ. J. Ex. K, ECF No. 49.) By October 2014, Defendants had successfully added six aircraft to Koury Aviation's Part 135 Certificate. (ECF No. 48 at Ex. B, 74:1–2.)

C.     **Carmayer's Search for an Aircraft**

19. In the spring of 2014, Scarfone began investigating the possibility of purchasing an aircraft. (ECF No. 54 at Ex. A, 93:11–15.) After looking at aircraft on the internet, Scarfone went to Carolina Aircraft, Inc. ("Carolina Aircraft") in Greensboro to look at a Baron BE 58 listed for sale. (ECF No. 54 at Ex. A, 92:3–93:15.) While looking at the Baron BE 58, Scarfone explained to George Johnson, the

owner of Carolina Aircraft, that Scarfone was looking for an aircraft to place on a charter program. (ECF No. 48 at Ex. D, 94:10–22.) Johnson suggested that Scarfone speak with Koury Aviation and walked Scarfone to Koury Aviation's office. (Aff. Rocco Scarfone ¶ 4, ECF No. 56; ECF No. 48 at Ex. D, 96:13–97:17.) Scarfone left his contact information with Koury Aviation and indicated that he was interested in purchasing an aircraft to place on a charter program. (ECF No. 48 at Ex. D, 97:18–25.)

20.     On April 24, 2014, Koury e-mailed Scarfone to discuss Scarfone's interest in purchasing an aircraft. (ECF No. 56 at Ex. A.) Koury informed Scarfone of two websites that listed aircraft for sale. (ECF No. 54 at Ex. A, 105:7−17.)

21.     During the summer of 2014, Rossabi and Scarfone agreed to invest, by and through Carmayer, in purchasing an aircraft. (ECF No. 48 at Ex. C, 13:14–19.) The primary purpose of purchasing an aircraft was to charter it, specifically on Koury Aviation's Part 135 Certificate. (ECF No. 48 at Ex. A, 68:10–15.) After partnering with Rossabi, Scarfone continued to search for aircraft for sale on the internet. (ECF No. 48 at Ex. D, 104:17–105:12.)

22.     During Scarfone's search, Koury told Scarfone that a twin-engine propeller aircraft would work well on a Part 135 certificate. (ECF No. 54 at Ex. C, 62:2−24.) Koury stated that adding a twin-engine propeller aircraft to Koury Aviation's Part 135 Certificate would help Koury Aviation attract new customers, as all of Koury Aviation's aircraft available for charter were jets. (ECF No. 48 at Ex. A, 101:20–23; ECF No. 48 at Ex. D, 77:1–14.) On more than one occasion during Scarfone's search

for an aircraft, Scarfone sent Koury internet links to specific twin-engine aircraft for sale that Scarfone thought may be suitable for Carmayer to purchase. (ECF No. 48 at Ex. D, 105:1–6; ECF No. 56 at ¶ 9.) Koury responded with his feedback, occasionally with input from Hurlocker. (ECF No. 48 at Ex. D, 105:1–6; ECF No. 56 at ¶ 9.)

23. On June 25, 2014, Koury e-mailed Scarfone a pro forma for a Cessna 414 (the "Pro Forma"). (ECF No. 56 at Ex. D.) In his e-mail, Koury stated "[Scarfone], attached is a somewhat conservative sheet which I feel will work for the 414, it was difficult to find much info, but I think we will be pretty close to the income, if not low." (ECF No. 56 at Ex. D.) The Pro Forma projected an annual profit of $44,192 if a Cessna 414 was chartered for 250 hours, and an annual profit of $159,212 if a Cessna 414 was chartered for 500 hours. (ECF No. 56 at Ex. D.)

**D. The Cessna 421C**

24. On September 1, 2014, Scarfone e-mailed Dan Howard ("Howard"), the broker for the seller of the Cessna 421C, to discuss Carmayer's interest in purchasing the Cessna 421C. (ECF No. 49 at Ex. W.) Howard informed Scarfone that the Cessna 421C was scheduled to begin a 100-hour annual inspection on September 2, 2014. (ECF No. 49 at Ex. W.) Howard further told Scarfone that two other potential buyers were planning to look at the Cessna 421C after the annual inspection was complete. (ECF No. 49 at Ex. W.) In response to Scarfone's price inquiries, Howard stated that, although the seller understood Carmayer's desire to purchase a plane that could be chartered pursuant to Part 135, the seller did not feel obligated to reduce the asking

price because most buyers of Cessna 421s operate the aircraft under part 91, which has less demanding maintenance requirements than Part 135. (ECF No. 49 at Ex. W; ECF No. 54 at Ex. B, 19:10−21.) As a result, Howard told Scarfone that the Cessna 421C would easily sell for between $185,000 and $195,000. (ECF No. 49 at Ex. W.) Howard finally stated "[i]t just sounds like this is not the plane for your mission." (ECF No. 49 at Ex. W.) Scarfone responded that he wanted to continue to discuss the sale of the Cessna 421C at the $185,000 to $195,000 range that Howard had suggested. (ECF No. 49 at Ex. W.)

25. On September 3, 2014, Scarfone informed Koury that the Cessna 421C's seller had accepted Carmayer's offer and asked Koury if he knew anyone in the Austin, Texas area, where the plane was at that time, who could do the pre-purchase inspection. (ECF No. 49 at Ex. P, DEF 00340.) Koury then asked Hurlocker if Hurlocker knew of anyone near Austin who could perform the pre-purchase inspection, and Hurlocker stated that he did not have any contacts in Texas. (ECF No. 49 at Ex. P, DEF 00341−42.) Shortly thereafter, the seller moved the Cessna 421C to Tulsa, Oklahoma. (ECF No. 49 at Ex. P, DEF 00342.)

26. On September 12, 2014, Carmayer went under contract to purchase the Cessna 421C. (ECF No. 49 at Ex. Y.) The contract was contingent on the completion of both the seller's 100-hour annual inspection and a pre-purchase inspection by Carmayer or a mechanic of Carmayer's choosing, and Carmayer could abandon the purchase based on the results of the pre-purchase inspection and receive a full refund of its deposit. (ECF No. 49 at Ex. Y.) A 100-hour annual inspection is an intensive

inspection of the aircraft required by the FAA in order for the aircraft to remain airworthy under either part 91 or Part 135. (ECF No. 48 at Ex. E, 19:12–14; ECF No. 48 at Ex. J, 9:9–17; ECF No. 54 at Ex. B, 17:17–19:22.) An average annual inspection for a Cessna 421C takes one to three weeks. (ECF No. 48 at Ex. E, 19:21–20:7.) Unlike a 100-hour annual inspection, there is no set definition of a pre-purchase inspection; the scope and extent of a pre-purchase inspection is within the buyer's discretion. (ECF No. 48 at Ex. E, 19:4–11.)

27. Steve Montgomery ("Montgomery") of Cimarron Aviation in Tulsa performed the seller's 100-hour annual inspection. (ECF No. 49 at Ex. P, DEF 00342–43.) On September 17, 2014, Scarfone hired Barry Bredensteiner ("Bredensteiner"), a mechanic in Tulsa, to perform Carmayer's pre-purchase inspection. (ECF No. 48 at Ex. F, 10:7–16; ECF No. 56 at Ex. J, DEF 01230.) There is a dispute of fact as to the scope of Bredensteiner's pre-purchase inspection.

### E. Hurlocker's Inspection

28. On September 24, 2014 at 1:39 p.m., Hurlocker e-mailed Scarfone stating

> [t]his is Tom Hurlocker and I work with Brad Koury's [Part] 135 operation. Did you need me to go look at the 421C you are buying. [sic] . . . I talked with [Bredensteiner] yesterday and he was not sure what the plans were for his pre-buy inspection.
>
> What help can I provide for your needs?

(ECF No. 56 at Ex. J, DEF 01243.) At 1:46 p.m., Scarfone responded to Hurlocker stating

> [Bredensteiner] is going to do the pre buy at his hangar but I think since you are going to be handling the [aircraft] for us once it arrives here that it would be beneficial for you to be there for the pre buy Inspection [sic]

and demo flight . [sic]  I want to make sure that the [aircraft] is mechanically sound as well as aesthetically an 8 1/2 as we have been told.  I can fly you to Tulsa and put you at a hotel provide [sic] meal per diem and pay you . [sic] What are your thoughts ? [sic]

(ECF No. 56 at Ex. J, DEF 01243.)  At 2:03 p.m., Hurlocker responded to Scarfone stating

I can go to Tulsa if needed when aircraft [sic] is opened and see where we are. . . . There are areas where corrosion can be bad on 400 series Cessna's [sic]. . . .

I will have to take vacation from my primary job, . . . so the sooner we can make a decisions [sic] the better.

(ECF No. 56 at Ex. J, DEF 01243.)  At 2:06 p.m., Scarfone responded to Hurlocker stating "[c]an you call [Bredensteiner] . . . and let him know that me and you [sic] have talked and that you want to be there when he has the [aircraft] opened up and the sooner he can let you know when that is the better , [sic] then I can make your flights etc." (ECF No. 56 at Ex. J, DEF 01244.)

29.    On September 26, 2014 at 12:45 p.m., Hurlocker e-mailed Scarfone and stated

I just talked with [Bredensteiner] and the 421C has not arrived at his shop at this time.  After his test flight we can determine if I am going to Tulsa. . . . If the flight test goes well, it make [sic] take two to three days before the plane is all opened.  I think I can see the items I would like to check in two days and review aircraft records.

Will this work for you?

(ECF No. 56 at Ex. J, DEF 01244.)  At 1:14 p.m., Scarfone responded to Hurlocker stating "[y]es this works for me just let me know so I can make your arrangements

the [aircraft] broker will pick you up at the Airport [sic] and take you to your hotel and then to [Bredensteiner]'s." (ECF No. 56 at Ex. J, DEF 01244.)

30.     Three days later, on September 29, 2014 at 3:04 p.m., Scarfone e-mailed Hurlocker asking "[i]f the demo flight goes well are you able to fly to Tulsa on Thursday ? [sic] and [sic] if so how many days do you want to stay ? [sic]" (ECF No. 56 at Ex. J, DEF 01235.)  At 3:45 p.m., Hurlocker responded to Scarfone "I think I can go to Tulsa on Thursday but I will confirm tomorrow, I have two aircraft to deliver Wednesday.  I thing [sic] a return flight on Saturday would be enough time to evaluate the aircraft." (ECF No. 56 at Ex. J, DEF 01235.)  At 9:58 p.m., Scarfone e-mailed Hurlocker and stated "I can book you a flight Thursday AM at 9:25am [sic] arrives in Tulsa at 1:15 PM then return Saturday departing Tulsa at 7:15AM [sic] back in GSO 1PM [sic].  Does that give you enough time to look examine [sic] the [aircraft] properly ? [sic]" (ECF No. 56 at Ex. J, DEF 00356.)

31.     The following day, on September 30, 2014 at 11:50 a.m., Hurlocker responded to Scarfone "I can go to Tulsa if the test flight goes well.  Let me know the details.  I will expect all expenses paid and labor rate of $40.00 per hour to travel and work on the aircraft. . . . Let me know the plans and what airports I will be visiting." (ECF No. 56 at Ex. J, DEF 00356.)  At 7:16 p.m., Scarfone responded to Hurlocker and stated

> [c]an you call [Bredensteiner] tomorrow and he can tell you how the demo flight went , [sic] for the most part it went well from what he said to me but I am not a mechanic or a pilot , [sic] there are a few issues that he found . [sic] I will make your reservations tomorrow to depart Thursday in the morning . [sic] Just for clarity I will pay your flights, hotel, meals or per diem either is fine and $40 per hour for working on

the [aircraft] , [sic] as far as paying $40 per hour for travel can you just clarify that to me ? [sic]

(ECF No. 56 at Ex. J, DEF 00356.) At 8:17 p.m., Hurlocker responded to Scarfone "[y]es. I can do the needed inspection and log book review. I talked to [Bredensteiner] late this afternoon and flight test went well." (ECF No. 56 at Ex. J, DEF 00356.) At 8:31 p.m., Scarfone responded to Hurlocker "K [sic] sounds good . [sic] I will have my secretary make ur [sic] arrangements tomorrow . [sic]" (ECF No. 56 at Ex. J, DEF 00357.)

32. On October 2, 2014, Hurlocker flew to Tulsa to look at the Cessna 421C. (ECF No. 56 at Ex. J.) After examining the Cessna 421C, Hurlocker e-mailed Scarfone on October 3, 2014 with what Hurlocker had found during his examination, stating

> I have inspected the 421C and reviewed the aircraft records. There are several items that should be considered before you close. The paint and interior is not above a 6 with the interior being stronger of the two. The paper work [sic] will take some attention to get approved for [Part] 135. The overhaul times from Continental engines is 1600 hours or 12 years. The engine has 296.6 hours and three years remaining before overhaul for 135 operation. The props are over the 6 year overhaul times. The copilots side window is chipped with shell cracking, the pilots storm window is cracked at latch. Stall warning inop [sic] and stall vane heat is inop [sic]. Hand held [sic] portable fire extinguisher is dated 1979, they have a 12 year life for hydrostatic test, cheaper to replace new. As you have been advised by [Bredensteiner], the exhaust wye replacement AD is over due [sic]. There is a fuel vent float valve, 600 hour recurring AD, is due in 44.0 hours, this is time consuming to perform. The right brake disc appears to be under thickness limits and the left may be out of limits, I did not have measuring equipment. We can go over my findings at your convenience.
>
> You can call anytime . . . .

(ECF No. 56 at Ex. J, DEF 01298.)  The following day, on October 4, 2014, Hurlocker e-mailed Scarfone numerous pictures of the plane that Hurlocker had taken during his inspection.  (ECF No. 56 at Ex. J, DEF 00380−93.)

33.    Scarfone never called Hurlocker to go over Hurlocker's findings.  (ECF No. 48 at Ex. B, 91:20−25, 95:16−20, 129:18−25.)  Scarfone forwarded Hurlocker's items to Bredensteiner to add to his pre-purchase inspection report.  (ECF No. 56 at Ex. J, DEF 01298.)  Two days later, Scarfone e-mailed Koury and Hurlocker stating that he had used the combined pre-purchase inspection report and costs to reduce the Cessna 421C's price from $185,000 to $165,000, and that Carmayer was closing on the Cessna 421C the following week.  (ECF No. 56 at Ex. J, DEF 00398; ECF No. 49 at Ex. U.)

F.    **Defendants' Attempt to Certify the Cessna 421C Under Part 135**

34.    After purchasing the Cessna 421C, Carmayer had it flown from Tulsa to Greensboro.  (ECF No. 48 at Ex. B, 189:17–20.)  In Greensboro, Koury Aviation began to address the items identified by Hurlocker's and Bredensteiner's inspections of the Cessna 421C.  (ECF No. 48 at Ex. B, 42:8–43:3.)

35.    On November 6, 2014, Carmayer and Koury Aviation executed an Aircraft Management and Lease Agreement (the "Lease Agreement").  (ECF No. 9 at 8, ¶ 7; ECF No. 11.1 at ¶ 7; ECF No. 56 at ¶ 30, Ex. L.)  The Lease Agreement specifically stated that "[Carmayer] and [Koury Aviation] wish for [Carmayer] to lease the [Cessna 421C] to [Koury Aviation] on a non-continuous basis for use by [Koury Aviation] in its air charter operations under Part 135 of the [Federal Aviation Regulations.]"  (ECF No. 56 at Ex. L.)  The Lease Agreement provided that Koury

Aviation was responsible for monitoring the mechanical condition of the Cessna 421C and arranging all maintenance, inspections, and overhaul of the aircraft at Carmayer's expense. (ECF No. 56 at Ex. L.)

36. Between November 2014 and May 2015, Koury and Scarfone communicated regularly about the status of placing the Cessna 421C on Koury Aviation's Part 135 Certificate. (ECF No. 56 at ¶ 31.)

37. Koury Aviation submitted the Cessna 421C to the FAA for a conformity inspection in June 2015. (ECF No. 48 at Ex. B, 201:25−202:6, 209:11−12.) On June 2, 2015, the FAA e-mailed Hurlocker a list of issues that were discovered during the FAA inspection, including that the conformity binder did not list the Cessna 421C's inspection and maintenance program and that the documentation of Montgomery's annual inspection was deficient. (ECF No. 49 at Ex. V.) On June 10, 2015, the FAA rejected additional documentation regarding Montgomery's annual inspection and told Hurlocker that the Cessna 421C still needed an annual inspection "completely in accordance" with the Cessna inspection program prior to adding the Cessna 421C to Koury Aviation's Part 135 Certificate. (Aff. Rocco Scarfone Ex. R, ECF No. 57.)

38. Thereafter, in June 2015, the Cessna 421C was taken to Air Wilmington, Inc. ("Air Wilmington") for a new annual inspection. (ECF No. 48 at Ex. B, 202:17–19; ECF No. 56 at ¶ 37.) On July 10, 2015, Hurlocker informed Scarfone that Air Wilmington discovered roughly 172 discrepancies with the Cessna 421C. (ECF No. 57 at Ex. T.) After Air Wilmington addressed the discrepancies, Carmayer refused to return the Cessna 421C to Koury Aviation for a conformity inspection by the FAA

because Carmayer believed that the aircraft could not be placed on a Part 135 certificate unless all Cessna Service Bulletins ("SBs") and Supplemental Inspection Directives ("SIDs") were performed. (ECF No. 48 at Ex. D, 164:21–165:22.) The Cessna 421C has not been submitted to the FAA for a second conformity inspection. (ECF No. 48 at Ex. D, 163:9–12.)

## IV. MOTION TO AMEND

39. Following the completion of discovery and briefing and oral argument on Defendants' Motion for Summary Judgment, Plaintiff filed its Motion to Amend. Carmayer seeks leave to amend its Complaint under Rule 15(a) to assert an alternative claim for breach of contract. The Motion to Amend states that

> [i]n light of Defendants' position in their supplemental brief, which was not alleged, and in fact was denied during deposition testimony, and out of the abundance of caution, Carmayer seeks to amend its complaint, to include an alternative claim for relief -- a breach of contract claim -- to ensure that any and all issues between the parties are litigated together at trial.

(Mot. to Am. Compl. ¶ 12, ECF No. 71.)

40. Rule 15(a) provides that, after a responsive pleading has been served, a party may amend his pleading only by leave of court or by written consent of the adverse party, and "leave shall be freely given when justice so requires." N.C. Gen. Stat. § 1A-1, Rule 15(a). "The party objecting to the amendment has the burden of establishing it will be materially prejudiced by the amendment." *N. River Ins. Co. v. Young*, 117 N.C. App. 663, 671, 453 S.E.2d 205, 210 (1995). A motion for leave to amend is addressed to the sound discretion of the trial court. *E.g.*, *Draughon v. Harnett Cty. Bd. of Educ.*, 166 N.C. App. 464, 467, 602 S.E.2d 721, 724 (2004).

Reasons justifying denial of a motion to amend are undue delay, bad faith, dilatory motive, repeated failure to cure defects by previous amendments, undue prejudice, and futility of amendment. *E.g.*, *JPMorgan Chase Bank, N.A. v. Browning*, 230 N.C. App. 537, 541, 750 S.E.2d 555, 559 (2013). "In deciding if there was undue delay, the trial court may consider the relative timing of the proposed amendment in relation to the progress of the lawsuit." *Draughon*, 166 N.C. App. at 467, 602 S.E.2d at 724. "[A] trial court may appropriately deny a motion for leave to amend on the basis of undue delay where a party seeks to amend its pleading after a significant period of time has passed since filing the pleading and where the record or party offers no explanation for the delay." *Rabon v. Hopkins*, 208 N.C. App. 351, 354, 703 S.E.2d 181, 184 (2010).

41.     The Court concludes, in its discretion, that the Motion to Amend should be denied based on Plaintiff's undue delay. Plaintiff filed the Motion to Amend one year and five months after it filed its original Complaint, one year and three months after Defendants filed their answer raising the economic loss doctrine as an affirmative defense, four months after the completion of discovery, three months after Defendants filed the Motion for Summary Judgment, and six weeks after the hearing on the Motion for Summary Judgment. There is no reason that Plaintiff could not have asserted an alternative claim for breach of contract in the original Complaint—in fact, the evidence shows that Plaintiff deliberately omitted such a claim. Rossabi, in addition to being a 50% owner of Carmayer, is a licensed North Carolina attorney and signed the Complaint in this case as counsel for Carmayer. (ECF No. 1 at 13.) During Rossabi's deposition on November 16, 2016—more than seven months before

Plaintiff filed the Motion to Amend—Rossabi testified multiple times that a contract existed between Plaintiff and Defendants, but that the claims asserted in the Complaint "were the appropriate claims" and a breach of contract was not alleged "because [Rossabi] chose[] to allege other things." (Defs.' Resp. Opp'n Pl.'s Mot. Amend Ex. A, at 44:23−24, 45:19−46:4, 46:20−47:12, 47:23−50:5, 58:2−7, ECF No. 77.2.) "As the material facts were clearly known to [Carmayer] from the outset, [Carmayer]'s delay was entirely undue." *United Leasing Corp. v. Miller*, 60 N.C. App. 40, 44, 298 S.E.2d 409, 412 (1982); *see also Wilkerson v. Duke Univ.*, 229 N.C. App. 670, 679, 748 S.E.2d 154, 161 (2013) (affirming trial court's denial of plaintiff's motion to amend based on undue delay and undue prejudice when the motion was made one year and one month after plaintiff filed his original complaint and five days before the hearing on defendants' motion for summary judgment); *Williams v. Craft Dev., LLC*, 199 N.C. App. 500, 510, 682 S.E.2d 719, 726 (2009) (affirming trial court's denial of plaintiff's motion to amend based on undue delay when the motion was filed more than one year after plaintiff filed her original complaint and after a hearing was held on the parties' cross-motions for summary judgment); *Media Network, Inc. v. Long Haymes Carr, Inc.*, 197 N.C. App. 433, 447−48, 678 S.E.2d 671, 681 (2009) (affirming trial court's denial of defendant's motion to amend when the motion was filed almost four months after defendant filed its original answer and defendant did not offer any credible explanation for the delay); *Draughon*, 166 N.C. App. at 467, 602 S.E.2d at 724 (affirming trial court's denial of plaintiff's motion to amend based on undue delay when the motion was filed one year and eleven months after plaintiff filed her second

complaint and less than one week before the hearing on defendant's motion to dismiss and motion for summary judgment); *Wall v. Fry*, 162 N.C. App. 73, 80, 590 S.E.2d 283, 287 (2004) (affirming trial court's denial of plaintiffs' motion to amend based on undue delay when the motion was filed one year and two months after plaintiffs filed their original complaint and after defendants filed motions for summary judgment); *Johnson v. Beverly-Hanks & Assocs., Inc.*, 97 N.C. App. 335, 341, 388 S.E.2d 584, 587 (1990) (affirming trial court's denial of plaintiffs' motion to amend based on undue delay when the motion was made seven months after plaintiffs filed their original complaint and there was nothing in the record to indicate why plaintiffs were delayed in moving to amend); *Wright v. Commercial Union Ins. Co.*, 63 N.C. App. 465, 469, 305 S.E.2d 190, 192 (1983) (affirming trial court's denial of plaintiffs' motion to amend based on undue delay when the motion was filed one year and two months after plaintiffs filed their original complaint, one year after defendant filed its answer, and one month after defendant filed its motion for summary judgment).

42.     Further, Plaintiff waited to file the Motion to Amend until almost four weeks after the Court ordered supplemental briefing on the application of the economic loss rule to Defendants' pending Motion for Summary Judgment, and after both Defendants and Plaintiff submitted supplemental briefs on that issue. *See Micro Capital Inv'rs, Inc. v. Broyhill Furniture Indus., Inc.*, 221 N.C. App. 94, 102−03, 728 S.E.2d 376, 382−83 (2012), *aff'd per curiam*, 366 N.C. 371, 736 S.E.2d 172 (2013) ("This Court has previously affirmed an order denying a motion to amend that was brought the same day that a summary judgement ruling was delivered in order to

avoid a possible adverse summary judgment ruling, explaining that the timing supported a finding of undue delay. . . . Although plaintiff filed its motion on the eve of the summary judgment hearing rather than on the day that the ruling came down, the timing still supports our conclusion that the trial court did not abuse its discretion by denying plaintiff's motion." (citation omitted) (quotation marks omitted)).

43.     Therefore, the Court, in its discretion, denies the Motion to Amend based on Plaintiff's undue delay.

## V.     MOTION FOR SUMMARY JUDGMENT

### A.     Claims for Relief

44.     Carmayer asserts claims against Defendants for negligent misrepresentation, negligence, gross negligence, breach of fiduciary duty, and UDTP. (ECF No. 1 at 8, 10−12.)  Defendants seek summary judgment on all of Carmayer's claims.  (ECF No. 45 at 1.)

### B.     Legal Standard

45.     Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law."  N.C. Gen. Stat. § 1A-1, Rule 56(c).  "A 'genuine issue' is one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000).  The moving party bears the burden of showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.  *Hensley v. Nat'l Freight Transp., Inc.*, 193 N.C. App.

561, 563, 668 S.E.2d 349, 351 (2008). "Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784−85, 534 S.E.2d 660, 664 (2000). The Court must view the evidence in the light most favorable to the nonmovant. *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835. However, the nonmovant "may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If [the nonmovant] does not so respond, summary judgment, if appropriate, shall be entered against [the nonmovant]." N.C. Gen. Stat. § 1A-1, Rule 56(e).

## C.    Negligent Misrepresentation

46.    Carmayer asserts that, prior to Carmayer's purchase of the Cessna 421C, Defendants made the following negligent misrepresentations to Carmayer: (1) the accuracy of the Pro Forma; (2) Defendants were experts in chartering aircraft under Part 135; (3) Defendants would inspect the Cessna 421C and the logbooks and advise Carmayer if the plane was the right one to purchase for Part 135 certification; (4) the costs of putting the Cessna 421C on a Part 135 certificate; and (5) Defendants knew what was required to put the Cessna 421C on Koury Aviation's Part 135 Certificate by the end of 2014. (Mem. Opp'n Defs.' Mot. Summ. J. 12, ECF No. 54.) Additionally, Carmayer contends that, after it purchased the Cessna 421C, Defendants

misrepresented the airworthiness of the Cessna 421C and the status of adding the aircraft to Koury Aviation's Part 135 Certificate.  (ECF No. 54 at 12.)

47.    "The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care."  *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 369, 760 S.E.2d 263, 267 (2014).  Under well-settled North Carolina law,

> [a] breach of duty that gives rise to a claim of negligent misrepresentation has been defined as:
>
> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, [and thus] is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Rountree v. Chowan Cty.*, 796 S.E.2d 827, 831 (N.C. Ct. App. 2017) (second alteration in original) (quoting *Simms v. Prudential Life Ins. Co. of Am.*, 140 N.C. App. 529, 534, 537 S.E.2d 237, 241 (2000)).  "The requirement of justifiable reliance is derived from Restatement § 552(1), providing 'liability for pecuniary loss caused to [the plaintiffs] by their justifiable reliance upon the information.'"  *Brinkman v. Barrett Kays & Assocs., P.A.*, 155 N.C. App. 738, 742, 575 S.E.2d 40, 44 (2003) (alteration in original) (quoting *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 206, 367 S.E.2d 609, 612 (1988), *rev'd on other grounds*, 329 N.C. 646, 407 S.E.2d 178 (1991)).  Justifiable reliance is analogous to reasonable reliance in fraud actions.  *Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP*, 350 N.C. 214, 224, 513 S.E.2d 320, 327 (1999).  "Reliance is not reasonable if a plaintiff fails to make any

independent investigation, or fails to demonstrate he was prevented from doing so." *Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 368 N.C. 440, 449, 781 S.E.2d 1, 8 (2015) (citations omitted) (quotation marks omitted). "Rather, 'to establish justifiable reliance a plaintiff must sufficiently allege that he made a reasonable inquiry into the misrepresentation and allege that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence.'" *Rountree*, 796 S.E.2d at 833 (quoting *Arnesen*, 368 N.C. at 454, 781 S.E.2d at 11). "Whether a party's reliance is justified is generally a question for the jury, except in instances in which the facts are so clear as to permit only one conclusion." *Dallaire*, 367 N.C. at 369, 760 S.E.2d at 267 (quotation marks omitted).

### 1. The Pro Forma.

48. Carmayer alleges that the Pro Forma misrepresented the profitability of the Cessna 421C. (ECF No. 54 at 12.)

49. Based on the undisputed evidence, the Court concludes as a matter of law that Carmayer did not justifiably rely on the Pro Forma because it was a contingent, future estimate. "What has been called 'promissory representations,' looking to the future as to what the vendee can do with the property, *how much he can make on it* . . . are on a par with false affirmations and opinions as to the value of property, and do not generally constitute legal fraud." *Williamson v. Holt*, 147 N.C. 515, 520, 61 S.E. 384, 386 (1908). The Pro Forma—titled "CESSNA 414 ESTIMATES"— merely projects estimates of expenses and gross income, and profit estimates based thereon, if a Cessna 414 was chartered for 250 hours and 500 hours, respectively.

The Pro Forma was, by its very terms, an estimate of future expenses, income, and profit based on contingent events, such as chartering the plane for 250 or 500 hours. The undisputed evidence shows that attempting to predict revenues or profits from chartering an aircraft is entirely speculative and "extremely hard." (ECF No. 48 at Ex. I, 95:3−10.) Carmayer could not have justifiably relied on a contingent estimate of future profits and expenses. *See Williamson*, 147 N.C. at 523, 61 S.E. at 387 ("[A misrepresentation] must be as to matters of fact substantially affecting his interest, not as to matters of opinion, judgment, probability, or expectation. An assertion respecting them is not an assertion as to any existent fact. The opinion may be erroneous; the judgment may be unsound; the expected contingency may never happen; the expectation may fail. An action of tort for deceit in the sale of property does not lie for false and fraudulent representations concerning profits that may be made from it in the future." (citation omitted)).

50. The Court further concludes as a matter of law that Carmayer did not justifiably rely on the Pro Forma because Carmayer failed to make a reasonable inquiry into the Pro Forma. Despite Koury's statement that "it was difficult to find much info," neither Scarfone nor Rossabi asked Koury how Koury came up with any of the numbers in the Pro Forma or if any variables could affect the estimates. (ECF No. 48 at Ex. D, 65:17–66:23, 67:7−68:1, 84:21−85:12.) Simply stated, the undisputed evidence shows that Plaintiff did not make any inquiry into the Pro Forma, reasonable or otherwise. Although Scarfone's affidavit states that Scarfone asked extensive questions regarding the Pro Forma, a party opposing summary judgment

cannot create a genuine issue of fact by filing an affidavit contradicting his prior testimony. *Supplee v. Miller-Motte Bus. Coll., Inc.*, 239 N.C. App. 208, 225, 768 S.E.2d 582, 596 (2015). Additionally, although Rossabi testified that he had a conversation with Koury regarding the Pro Forma, there is no evidence that Rossabi inquired of Koury as to Koury's basis for any of the estimates in the Pro Forma; rather, Rossabi's testimony reflects a conversation between Rossabi and Koury during which Koury went through the Pro Forma's terms and numbers and said that he could "rent the shit out of [the Cessna 421C]." (ECF No. 54 at Ex. D, 34:24−36:5, 95:8−18.)

51.     Carmayer further argues that Carmayer made a reasonable inquiry into Defendants' reputation sufficient to create a jury issue as to whether Carmayer justifiably relied. (ECF No. 54 at 12−13.) This argument is unavailing. Carmayer's inquiries of Dean Green, Scarfone's acquaintance who owns multiple charter jets, and Dave Hamrick, a pilot whose wife had worked as a flight attendant for Koury Aviation, into Defendants' reputations were not inquiries into the information in the Pro Forma—the basis for the misrepresentation claim. (ECF No. 54 at Ex. A, 88:20−89:7; ECF No. 54 at Ex. D, 92:3, 92:19−95:7.) Further, neither Green nor Hamrick provided Carmayer with any relevant information such that it would have been reasonable for Carmayer to rely on the Pro Forma. (ECF No. 54 at Ex. A, 88:20−89:7; ECF No. 54 at Ex. D, 91:22−92:3, 92:19−95:7.)

52.     In sum, the Court concludes as a matter of law that, based on the undisputed evidence, Carmayer did not justifiably rely on the Pro Forma because it

was a contingent, future estimate, and Carmayer did not make a reasonable inquiry into the Pro Forma. Therefore, Defendants are entitled to judgment as a matter of law on Carmayer's negligent misrepresentation claim to the extent that such claim is based on the Pro Forma.

### 2. Defendants were experts in chartering aircraft under Part 135.

53. Carmayer contends that Defendants misrepresented that they were experts in chartering aircraft under Part 135. (ECF No. 54 at 12.) Defendants argue that Carmayer has offered no evidence to show that Defendants made such a representation. (Reply Supp. Defs.' Mot. Summ. J. 7, ECF No. 63.)

54. The Court concludes as a matter of law that, based on the undisputed evidence, Defendants' representation that Hurlocker was an expert in chartering aircraft under Part 135 was not made without reasonable care. The undisputed evidence shows that Koury Aviation, of which Hurlocker is the director of maintenance, has had a Part 135 certificate since January 17, 2013. (ECF No. 56 at ¶ 7.) The undisputed evidence further shows that Koury Aviation had added and operated six jets on Koury Aviation's Part 135 Certificate with little to no problems with the FAA, (ECF No. 48 at Ex. B, 74:1–2), and, according to Carmayer's expert, an individual who has added six aircraft to a Part 135 certificate in three years is an expert in putting aircraft on a Part 135 certificate, (ECF No. 48 at Ex. I, 23:9–18). Further, Hurlocker testified that he participated in getting a Cessna twin-engine plane on a Part 135 certificate for another charter company in 1987 and that he, as the director of maintenance at that time, maintained the plane on the Part 135

certificate until 2005 or 2006. (ECF No. 48 at Ex. B, 53:3−54:18.) Therefore, Defendants are entitled to judgment as a matter of law on Carmayer's negligent misrepresentation claim to the extent that such claim is based on Defendants' representation that Hurlocker was an expert.

55. On the other hand, the Court concludes that there is a genuine issue of material fact as to whether Defendants' alleged representation that Koury, as opposed to Koury Aviation, was an expert in chartering aircraft under Part 135 was made without reasonable care. Contrary to Defendants' contention, Scarfone stated in his affidavit that Koury advised Scarfone that Koury—not Koury Aviation—was an expert in chartering aircraft under Part 135. (ECF No. 56 at ¶ 7.) Further, Carmayer submitted deposition testimony of Koury stating that Koury does not know how to put a plane on a Part 135 certificate and that he has never known how to do so. (ECF No. 54 at Ex. C, 54:21−25.) Koury also testified that "[t]he inspections for the airplane to put it on a 135, I don't do all that, or the compliance." (ECF No. 54 at Ex. C, 75:11−13.)

56. Taking all the evidence in the light most favorable to Carmayer, the Court concludes that there is a genuine issue of material fact as to whether Defendants negligently misrepresented that Koury was an expert in chartering aircraft under Part 135. *See Creech v. Melnik*, 347 N.C. 520, 526, 495 S.E.2d 907, 911 (1998) ("Before summary judgment may be entered, it must be clearly established by the record before the trial court that there is a lack of any triable issue of fact. In making this determination, the evidence forecast by the party against whom summary judgment

is contemplated is to be indulgently regarded, while that of the party to benefit from summary judgment must be carefully scrutinized." (citation omitted)). Therefore, Defendants' Motion for Summary Judgment on Carmayer's negligent misrepresentation claim is denied to the extent that such claim is based on Defendants' representation that Koury was an expert.

### 3. Hurlocker's inspection.

57. At the outset, the Court notes that it is unclear what Carmayer contends Defendants misrepresented with respect to Hurlocker's inspection of the plane in Tulsa. In its brief, Carmayer states that "Defendants represented that they would inspect the plane and the logbooks and advise Carmayer if the plane was the right one to purchase for Part 135 certification[,]" that "Hurlocker was negligent when he made multiple misrepresentations, including that he was capable of inspecting the 421C in order to determine if it was a good aircraft to purchase, airworthy and easily added [sic] to a Part 135 Certificate[,]" and "Hurlocker never advised [Scarfone] that [Hurlocker] would be unable to provide insight as to whether the 421C should be purchased or if it was capable of going on a Part 135 after conducting his inspection." (ECF No. 54 at 12−13.)

58. To the extent Carmayer contends that Hurlocker negligently misrepresented that he would inspect the plane and logbooks and advise Carmayer on whether the plane was suitable for Part 135 certification, this is not a misrepresentation that can serve as the basis for a negligent misrepresentation claim. It is well established that negligent misrepresentation occurs when one relies

on *information* prepared without reasonable care in the course of one's business or profession. *E.g.*, *Dallaire*, 367 N.C. at 369, 760 S.E.2d at 267; *Rountree*, 796 S.E.2d at 830–31; *Walker v. Town of Stoneville*, 211 N.C. App. 24, 30, 712 S.E.2d 239, 244 (2011). Hurlocker's representation that he was going to do an act, which Carmayer contends Hurlocker failed to do, is not the supplying of information necessary to serve as the basis for a negligent misrepresentation claim.

59. To the extent Carmayer contends that Hurlocker negligently misrepresented that he was capable of inspecting the plane in order to determine whether it was a good aircraft to purchase, airworthy, and could easily be added to Koury Aviation's Part 135 Certificate, there is no evidence in the record that Hurlocker ever represented to Carmayer that the inspection Hurlocker would perform in Tulsa would allow him to make those determinations. Hurlocker first asked Scarfone if Scarfone needed Hurlocker "to go look at the 421C." (ECF No. 56 at Ex. J, DEF 01243.) In response, Scarfone stated that "it would be beneficial for [Hurlocker] to be there for the pre buy Inspection [sic] and demo flight[,]" and that Scarfone "want[ed] to make sure that the [aircraft] [was] mechanically sound as well as aesthetically an 8 1/2 as [they] ha[d] been told." (ECF No. 56 at Ex. J, DEF 01243.) Thereafter, Hurlocker e-mailed Scarfone and stated that he could go to Tulsa when the aircraft was opened and "see where we are. . . . There are areas where corrosion can be bad[.]" (ECF No. 56 at Ex. J, DEF 01243.) After speaking with Bredensteiner, Hurlocker e-mailed Scarfone and said "I think I can see the items I would like to check in two days and review aircraft records." (ECF No. 56 at Ex. J, DEF 01244.)

Subsequent e-mails between Scarfone and Hurlocker discussed Hurlocker traveling to Tulsa to "evaluate the aircraft," "examine the [aircraft] properly," and "work on the aircraft." (ECF No. 56 at Ex. J, DEF 01235, 00356.) The last e-mail in the record regarding the services Hurlocker was to perform in Tulsa is an e-mail from Hurlocker to Scarfone stating that Hurlocker "can do the needed inspection and log book review." (ECF No. 56 at Ex. J, DEF 00356.) In short, there is no evidence in the record that Hurlocker told Scarfone that he was capable of inspecting the plane in order to determine whether the Cessna 421C was a good aircraft to purchase, airworthy, and capable of easily being added to a Part 135 certificate. Rather, the evidence shows that Hurlocker stated that he could go to Tulsa when the aircraft was opened and "see where we are" and do the "needed inspection" and review aircraft records. (ECF No. 56 at Ex. J, DEF 01243−44, 00356.)

60. Likewise, to the extent Carmayer contends that Hurlocker failed to inform Carmayer that Hurlocker's inspection would not permit him to advise Carmayer as to whether the Cessna 421C should be purchased or whether it was capable of Part 135 certification, as discussed above, there is no evidence that Hurlocker had a duty to specifically advise Carmayer to that effect. Rather, the undisputed evidence shows that Hurlocker stated that he would go to Tulsa to do the "needed inspection" and review the logbooks. Moreover, such an omission cannot serve as the basis for a negligent misrepresentation claim. *DeGorter v. Capitol Wealth, Inc.*, 2016 NCBC LEXIS 44, at \*26 n.2 (N.C. Super. Ct. May 31, 2016) (stating that negligent omissions

cannot serve as a basis for a negligent misrepresentation claim under North Carolina law).

61.     In sum, the Court concludes that Hurlocker's representation that he was going to inspect the plane and advise Carmayer, and any alleged omissions by Hurlocker, are not the supplying of information necessary to serve as a basis for a negligent misrepresentation claim.  The Court further concludes that the record is devoid of any evidence, and Carmayer has failed to come forward with such evidence so as to create a genuine issue of fact, that Hurlocker represented that he was capable of inspecting the plane to determine whether it was a good plane to purchase, airworthy, or easily capable of being added to Koury Aviation's Part 135 Certificate. Therefore, Defendants are entitled to judgment as a matter of law on Carmayer's negligent misrepresentation claim to the extent that such claim is based on representations regarding Hurlocker's inspection.

### 4. The costs of putting the Cessna 421C on Koury Aviation's Part 135 Certificate.

62.     Carmayer contends that, after Hurlocker conducted his inspection in Tulsa, Defendants misrepresented the costs of putting the plane on Koury Aviation's Part 135 Certificate.  (ECF No. 54 at 12.)  Carmayer contends that it negotiated a lower purchase price by about $20,000 to $25,000 to cover repairs that Hurlocker and Bredensteiner said were needed in order to get the Cessna 421C on Koury Aviation's Part 135 Certificate, (ECF No. 56 at ¶ 27), but that Carmayer has spent about $200,000 on maintenance and repairs, (ECF No. 56 at ¶ 28).

63.    Hurlocker's representation of the repair costs is intertwined with Hurlocker's alleged representation regarding his inspection.  As previously discussed, there is no evidence that Hurlocker represented that he would inspect the plane in order to determine whether it could easily be added to Koury Aviation's Part 135 Certificate.  Rather, the evidence shows that Hurlocker represented that he would look at the aircraft and its logbooks.  Accordingly, when Hurlocker provided price estimates to Scarfone in response to Scarfone's October 5, 2014 e-mail asking Hurlocker to provide prices for the items Hurlocker found during his inspection that needed to be repaired, Hurlocker provided price estimates for leather work, paint, the co-pilot's side window, and labor.  (ECF No. 56 at Ex. J, DEF 01378.)  There is no evidence in the record that Hurlocker represented that the price estimates he provided covered all repairs necessary to get the plane on a Part 135 Certificate, or that Scarfone asked for such specific price estimates.

64.    Therefore, Defendants are entitled to judgment as a matter of law on Carmayer's negligent misrepresentation claim to the extent that such claim is based on representations regarding the costs of putting the Cessna 421C on Koury Aviation's Part 135 Certificate.

### 5.    Defendants knew what was required to put the Cessna 421C on Koury Aviation's Part 135 Certificate by the end of 2014.

65.    Carmayer contends that Defendants misrepresented that they knew what was required to put the Cessna 421C on Koury Aviation's Part 135 Certificate by the end of 2014.  (ECF No. 54 at 12.)  Defendants argue that the representation was not prepared without reasonable care.  (ECF No. 63 at 5.)

66. It is undisputed that Defendants represented to Carmayer that the Cessna 421C would be added to Koury Aviation's Part 135 Certificate by the end of 2014 and that it was not, and still has not, been certified under Part 135. (ECF No. 48 at Ex. A, 69:5−12, 70:12−6; ECF No. 56 at ¶ 27.) The Court concludes, however, that there is a genuine issue of material fact as to whether Defendants made this representation without reasonable care.

67. On the one hand, Defendants submitted evidence showing that Koury Aviation had added six aircraft to Koury Aviation's Part 135 Certificate. (ECF No. 48 at Ex. B, 74:1–6.) All six aircraft were added to Koury Aviation's Part 135 Certificate in less than six months. (Reply Supp. Defs.' Mot. Summ. J. Ex. BB, at 52:10–25, ECF No. 63.1.)

68. On the other hand, William Cherry, Air Wilmington's general manager, testified that if the aircraft was "picture perfect" and one had in-depth knowledge about the aircraft, it would be possible to get the aircraft Part 135 certified by the FAA in thirty to sixty days. (ECF No. 63.1 at Ex. CC, 176:8–177:19.) Further, the evidence shows that there is a difference of opinion in the industry as to whether the FAA requires an aircraft to be maintained on the factory maintenance program, which mandates compliance with SBs and SIDs, in order to be certified under Part 135. Hurlocker testified that compliance with SBs and SIDs is not required for the Cessna 421C to be certified under Part 135. (ECF No. 48 at Ex. B, 67:8−69:2, 70:12−23.) Conversely, William Cherry testified that compliance with SBs and SIDs is mandatory in order for the Cessna 421C to be certified under Part 135. (ECF No.

54 at Ex. H, 121:11−122:6, 131:5−133:1, 201:12−25.) Christopher McPherson, Air Wilmington's director of maintenance, testified that whether compliance with SBs and SIDs is required in order for the Cessna 421C to be Part 135 certified is an open question. (ECF No. 48 at Ex. J, 54:2−55:25, 56:21−57:1, 58:5−20; ECF No. 54 at Ex. B, 43:15−44:5, 235:7−24, 238:24−240:4, 256:25−257:5.) McPherson further testified that the principal maintenance inspectors interpret the Federal Aviation Regulations inconsistently. (ECF No. 54 at Ex. B, 44:6−45:7.)

69. Taking all the evidence in the light most favorable to Carmayer, as it must at this stage, the Court concludes that there is a genuine issue of material fact as to whether Defendants negligently misrepresented that they knew what was required to put the Cessna 421C on Koury Aviation's Part 135 Certificate by the end of 2014. Therefore, Defendants' Motion for Summary Judgment as to Carmayer's negligent misrepresentation claim is denied to the extent that this claim is based on Defendants' representation that they knew what it took to get the Cessna 421C on Koury Aviation's Part 135 Certificate by the end of 2014.

### 6. The airworthiness of the Cessna 421C and the status of adding the aircraft to Koury Aviation's Part 135 Certificate.

70. Carmayer contends that, after it purchased the Cessna 421C, Defendants misrepresented the airworthiness of the Cessna 421C and the status of adding the aircraft to Koury Aviation's Part 135 Certificate. (ECF No. 54 at 12.)

71. The Court concludes that, based on the undisputed evidence, the Lease Agreement governs Defendants' duty to properly advise Carmayer of the Cessna 421C's condition and certification status and, as a result, Carmayer's negligent

misrepresentation claim based on Defendants' representations after the purchase of the Cessna 421C are barred by the economic loss rule.

72. The economic loss rule prohibits recovery in tort for purely economic loss arising out of a breach of contract. *Rountree*, 796 S.E.2d at 830. As stated by our Court of Appeals,

> [a] tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract, even if that failure to perform was due to the negligent or intentional conduct of that party, when the injury resulting from the breach is damage to the subject matter of the contract. It is the law of contract and not the law of negligence which defines the obligations and remedies of the parties in such a situation.

*Id.* (quoting *Lord v. Customized Consulting Specialty, Inc.*, 182 N.C. App. 635, 639, 643 S.E.2d 28, 30−31 (2007)). "[I]n order to maintain tort claims for conduct also alleged to be a breach of contract, a plaintiff must identify a duty owed by the defendant separate and distinct from any duty owed under a contract." *Forest2Market, Inc. v. Arcogent, Inc.*, 2016 NCBC LEXIS 3, at *8 (N.C. Super. Ct. Jan. 5, 2016) (quotation marks omitted); *see also Rountree*, 796 S.E.2d at 831 ("[A] viable tort action must be grounded on a violation of a *duty* imposed by operation of law, and the right invaded must be one that the law provides without regard to the contractual relationship of the parties." (quotation marks omitted)).

73. On November 6, 2014, less than a month after Carmayer purchased the Cessna 421C, Carmayer and Koury Aviation entered into the Lease Agreement. (ECF No. 9 at 8, ¶ 7; ECF No. 11.1 at ¶ 7; ECF No. 56 at ¶ 30, Ex. L.) The purpose of the Lease Agreement was to facilitate the charter of the Cessna 421C under Part 135

through Koury Aviation. Koury Aviation was responsible for monitoring the mechanical condition of the Cessna 421C and advising Carmayer on the status of all scheduled maintenance, inspections, and overhaul of the Cessna 421C. (ECF No. 56 at Ex. L.) The Lease Agreement expressly provided that "the [Cessna 421C] shall be maintained and inspected by [Koury Aviation], in accordance with the requirements of Part 135[.]" (ECF No. 56 at Ex. L.)

74. Carmayer has presented no evidence that Defendants owed Carmayer a separate and distinct duty to maintain the Cessna 421C and add it to Koury Aviation's Part 135 Certificate from that under the Lease Agreement. Defendants' representations after the purchase of the Cessna 421C are within the scope of the Lease Agreement as they relate to Koury Aviation's certification of the Cessna 421C under Part 135 and Koury Aviation providing Carmayer with information regarding the mechanical condition of the Cessna 421C. Carmayer has not alleged any physical injury and is seeking to recover for purely economic loss.

75. Therefore, based on the undisputed evidence, the Court concludes as a matter of law that Carmayer's negligent misrepresentation claim is barred by the economic loss rule to the extent that it is based on Defendants' alleged representations regarding the condition and certification status of the aircraft that were made after entering into the Lease Agreement.

D.   **Negligence**

76. At the outset, the Court notes that Carmayer's negligence claim appears to be indistinguishable from Carmayer's negligent misrepresentation claim. Carmayer

contends that it hired Hurlocker "to go to Tulsa in order to inspect the 421C so that he could properly advise Carmayer as to whether or not the 421C was a good aircraft to purchase in order to put onto Koury Aviation's Part 135 Certificate[,]" and that "[t]he duty that Defendants possessed was to use ordinary care in how it advised Carmayer." (ECF No. 54 at 18.) As discussed with respect to Carmayer's negligent misrepresentation claim, the undisputed evidence shows that Hurlocker told Carmayer that he would go to Tulsa to look at the aircraft and review its logbooks— not that he would determine whether it was a suitable plane to purchase to put on Koury Aviation's Part 135 Certificate. The undisputed evidence further shows that Hurlocker did go to Tulsa, looked at the aircraft and its logbooks, and advised Carmayer. In fact, the undisputed evidence shows that Hurlocker e-mailed Scarfone on October 3, 2014—the day after he flew to Tulsa—stating that he had inspected the Cessna 421C and reviewed the logbooks and that "[t]here are several items that should be considered before you close." (ECF No. 56 at Ex. J, DEF 01298.) After reciting numerous issues Hurlocker found with the plane and its logbooks, Hurlocker stated that they could go over Hurlocker's findings at Scarfone's convenience and told Scarfone to call him at any time. (ECF No. 56 at Ex. J, DEF 01298.) Scarfone, however, never called Hurlocker and instead proceeded to close on the plane. (ECF No. 48 at Ex. B, 91:20−25, 95:16−20, 129:18−25.)

77. Therefore, because Carmayer's negligence claim is indistinguishable from Carmayer's negligent misrepresentation claim to the extent that such claim is based on representations regarding Hurlocker's inspection, and because the Court has

determined that Carmayer has failed to come forward with evidence to create a genuine issue of material fact as to that claim, the Court likewise concludes that Carmayer has failed to come forward with sufficient evidence to create a genuine issue of material fact that Hurlocker had a duty to inspect the plane to determine whether the plane was a suitable plane capable of Part 135 certification. Accordingly, Defendants are entitled to judgment as a matter of law on Carmayer's negligence claim.

### E.    Gross Negligence

78.    Carmayer contends that Defendants were grossly negligent in encouraging Scarfone, Rossabi, and their guests to use the Cessna 421C from November 2014 through May 2015 when it was not airworthy.  (ECF No. 54 at 19−20.)

79.    In addition to the elements of negligence, gross negligence requires evidence of "wanton conduct done with conscious or reckless disregard for the rights and safety of others." *Parish v. Hill*, 350 N.C. 231, 239, 513 S.E.2d 547, 551 (1999) (quoting *Bullins v. Schmidt*, 322 N.C. 580, 583, 369 S.E.2d 601, 603 (1988)).  "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others."  *Yancey v. Lea*, 354 N.C. 48, 52, 550 S.E.2d 155, 157 (2001).  In describing the difference between ordinary and gross negligence, our Supreme Court has stated:

> [T]he difference between the two is not in degree or magnitude of inadvertence or carelessness, but rather is intentional wrongdoing or deliberate misconduct affecting the safety of others. An act or conduct rises to the level of gross negligence when the *act* is done purposely and with knowledge that such act is a breach of duty to others, i.e., a *conscious* disregard of the safety of others.

*Ray v. N.C. Dep't of Transp.*, 366 N.C. 1, 13, 727 S.E.2d 675, 684 (2012) (quoting *Yancey*, 354 N.C. at 53, 550 S.E.2d at 158).

80.    Defendants have satisfied their initial burden under Rule 56 by pointing to undisputed evidence that Defendants did not know the aircraft was not airworthy during the period from November 2014 through May 2015 when Scarfone, Rossabi, and their guests flew on the Cessna 421C.  Bredensteiner testified that it is not possible for someone to identify mechanical problems and determine whether a plane is safe unless he completely opens the plane up and performs an annual inspection. (ECF No. 48 at Ex. F, 14:4−15:12, 17:4−23.)  Otherwise, one must accept that the plane had gone through a complete annual inspection and the inspector's opinion that the aircraft is in airworthy condition.  (ECF No. 48 at Ex. F, 14:20−15:12.) Bredensteiner further testified that there was no way for Hurlocker to know whether Montgomery had performed a comprehensive annual inspection.  (ECF No. 48 at Ex. F, 32:22−25.)  Although Hurlocker testified that he had concerns about the annual inspection when he looked at the records in Tulsa, he testified that there was no way for him to know if the annual inspection was properly done.  (ECF No. 48 at Ex. B, 95:2−18.)   Moreover, Hurlocker testified that he asked Montgomery for the airworthiness directives but that he never received them.  (ECF No. 54 at Ex. F, 78:4−19.)  The undisputed evidence shows that Defendants first learned that the annual inspection was not properly performed and that the plane was not airworthy in June 2015, at which time Defendants sent the plane to Air Wilmington for a full annual inspection.  (ECF No. 49 at Ex. V.)

81. Carmayer has failed to come forward with evidence that Defendants were aware that the plane was not airworthy or safe when Scarfone and Rossabi flew in the plane in November 2014 through May 2015 so as to create a genuine issue of fact. As a result, the undisputed evidence shows that Defendants did not intentionally or deliberately encourage Scarfone and Rossabi to fly on the Cessna 421C knowing that it was unsafe. Further, although Carmayer argues that it has spent in excess of $200,000 on repairs in order for the Cessna 421C to be deemed airworthy, there is no evidence that Carmayer sustained any damage as a result of flying the plane when it was not airworthy. Therefore, the Court concludes that Defendants are entitled to judgment as a matter of law on Carmayer's gross negligence claim.

## F. **Breach of Fiduciary Duty**

82. Carmayer argues that Defendants owed Carmayer a fiduciary duty because Carmayer relied on Defendants' expertise and Defendants held all of the technical information. (ECF No. 54 at 17.)

83. A breach of fiduciary duty requires the existence of a fiduciary relationship. *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001). "[A] fiduciary relationship is generally described as arising when there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Dallaire*, 367 N.C. at 367, 760 S.E.2d at 266 (quotation marks omitted). Domination and influence are an essential component of any fiduciary relationship. *Dalton*, 353 N.C. at 652, 548 S.E.2d at 708. "The standard for finding a *de facto* fiduciary relationship

is a demanding one: 'Only when one party figuratively holds all the cards—all the financial power or technical information, for example—have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen.'" *Lockerman v. S. River Elec. Membership Corp.*, 794 S.E.2d 346, 352 (N.C. Ct. App. 2016) (quoting *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 613, 659 S.E.2d 442, 451 (2008)).

84. Defendants have satisfied their initial burden under Rule 56 by pointing to undisputed evidence that Defendants did not possess the requisite domination and influence over Carmayer to create a fiduciary relationship. The undisputed evidence shows that Carmayer was in control of every aspect of the purchase of the Cessna 421C, and that Defendants did not possess all the authority or technical information regarding the Cessna 421C. Carmayer identified the Cessna 421C and independently selected and hired Bredensteiner to do the pre-purchase inspection, and Montgomery—someone whom neither Koury nor Hurlocker knew of—conducted the 100-hour annual inspection prior to Carmayer purchasing the Cessna 421C. Although Hurlocker asked Scarfone to call him to go over Hurlocker's findings, the undisputed evidence shows that Scarfone did not call him. Instead, Scarfone proceeded to close on the purchase of the Cessna 421C, demonstrating Defendants' lack of domination and influence over Carmayer.

85. Carmayer has not come forward with sufficient evidence to create a genuine issue of material fact that Defendants owed Carmayer a fiduciary duty. Carmayer merely contends that Defendants held themselves out as experts and that Carmayer

was relying on Defendants. This is insufficient to create a fiduciary relationship. Therefore, the Court concludes that Defendants are entitled to judgment as a matter of law on Carmayer's breach of fiduciary duty claim.

### G. UDTP

86. Carmayer's UDTP claim is based on Carmayer's negligent misrepresentation and breach of fiduciary duty claims. (ECF No. 54 at 15–16.)

87. In order to state a UDTP claim, Carmayer must establish (1) an unfair or deceptive act or practice, (2) in or affecting commerce, (3) which proximately caused injury to Carmayer. *Belcher v. Fleetwood Enters., Inc.*, 162 N.C. App. 80, 85, 590 S.E.2d 15, 18 (2004). Under certain circumstances, a negligent misrepresentation may constitute an unfair or deceptive act when a party's words or conduct has the tendency or capacity to mislead or create a likelihood of deception. *First Atl. Mgmt. Corp. v. Dunlea Realty Co.*, 131 N.C. App. 242, 254, 507 S.E.2d 56, 64 (1998). When the evidence raises material issues of fact concerning negligent misrepresentation, the jury determines those issues of fact and the court determines whether the proven facts amount to unfair or deceptive trade practices. *Forbes v. Par Ten Grp., Inc.*, 99 N.C. App. 587, 601, 394 S.E.2d 643, 651 (1990).

88. Therefore, because the Court has concluded that there is a genuine issue of material fact regarding Defendants' representations that Koury was an expert in chartering aircraft under Part 135 and that Defendants knew what was required to get the Cessna 421C on Koury Aviation's Part 135 Certificate by the end of 2014, the Court likewise concludes that there is a genuine issue of material fact as to

Carmayer's UDTP claim based on these alleged misrepresentations. Otherwise, as the Court has concluded that there is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law on Carmayer's negligent misrepresentation claim in all other respects, as well as its breach of fiduciary duty claim, the Court grants summary judgment in favor of Defendants and against Carmayer on Carmayer's UDTP claim to the extent it is based on Carmayer's claims for negligent misrepresentation in all other respects and breach of fiduciary duty.

### H. Punitive Damages

89. Pursuant to N.C. Gen. Stat. § 1D-15(a), punitive damages may be awarded only if Plaintiff proves that Defendants are liable for compensatory damages and that either fraud, malice, or willful or wanton conduct was present and related to the injury for which compensatory damages were awarded. N.C. Gen. Stat. § 1D-15(a).

90. Carmayer contends that it is entitled to punitive damages in connection with its breach of fiduciary duty and gross negligence claims. (ECF No. 54 at 20.) The Court has concluded that Defendants are entitled to judgment as a matter of law on these claims and, as such, the Court concludes as a matter of law that Carmayer is not entitled to punitive damages.

### I. Lost Profits

91. Defendants state that they "anticipate that Carmayer will seek as damages amounts it contends it would have made if the Cessna had been added to Koury Aviation's Part 135 Certificate" and that "Defendants are entitled to summary judgment on any request for lost profits or future earnings because Carmayer cannot

present evidence of those alleged damages with 'reasonable certainty.'" (ECF No. 46 at 24.)

92. Carmayer did not allege lost profits in its Complaint, and Carmayer has not sought to recover lost profits. Therefore, this issue is not ripe for determination and, as such, Defendants' Motion for Summary Judgment as to this request is denied.

## VI. CONCLUSION

93. For the foregoing reasons, the Court **DENIES** Plaintiff's Motion to Amend and **GRANTS in part** and **DENIES in part** Defendants' Motion for Summary Judgment as follows:

A. The Court **DENIES** Defendants' Motion for Summary Judgment on Plaintiff's claim for negligent misrepresentation to the extent it is based on Defendants' representations that Koury was an expert and Defendants knew what was required to get the Cessna 421C on Koury Aviation's Part 135 Certificate by the end of 2014, and such claim shall go forward to trial. The Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's claim for negligent misrepresentation in all other respects, and such claim is dismissed with prejudice.

B. The Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's claims for negligence, gross negligence, and breach of fiduciary duty, and such claims are dismissed with prejudice.

C.      The Court **DENIES** Defendants' Motion for Summary Judgment on Plaintiff's UDTP claim to the extent it is based on Defendants' representations that Koury was an expert and Defendants knew what was required to get the Cessna 421C on Koury Aviation's Part 135 Certificate by the end of 2014, and such claim shall go forward to trial. The Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's UDTP claim in all other respects, and such claim is dismissed with prejudice.

D.      The Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's request for punitive damages.

E.      The Court **DENIES** Defendants' Motion for Summary Judgment on Defendants' request to preclude Plaintiff from recovering lost profits, without prejudice to Defendants' right to renew their request at such time as Plaintiff may attempt to argue such right to recovery.

**SO ORDERED**, this the 11th day of September, 2017.


/s/ Michael L. Robinson
Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases